Filed 4/4/13  In re Mercedes S. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re MERCEDES S., et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ALEX S., <br><br> Defendant and Appellant. | F065320 <br><br> (Super. Ct. Nos. 0096962-4, 0096962-5) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Appellant.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Alex S. appeals from an order terminating his parental rights (Welf. & Inst. Code, § 366.26)[1] to his daughters, 11-year-old Mercedes and 10-year-old Alexandria (collectively the girls). He contends the juvenile court erred by rejecting his argument that termination would be detrimental to the girls based on their relationship with him. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

These dependency proceedings were initiated in October 2005, when Lydia C., the girls' mother, and father, Lydia's boyfriend, were arrested after police found drugs and drug paraphernalia in their home. The girls, then four and three years old, were taken into protective custody and detained. The juvenile court took dependency jurisdiction over the girls due to ongoing domestic violence between their parents, as well as the parents' history of substance abuse. At a contested dispositional hearing, the juvenile court ordered reunification services for father but denied them to mother.[2] In May 2006, the girls were placed with a maternal aunt and uncle. Father failed to comply with his reunification services and, at a January 2007 12-month review hearing, the juvenile court terminated his services and set a section 366.26 hearing.

The section 366.26 hearing did not occur until September 2007. In March 2007, the relatives with whom the girls were placed told the social worker they no longer wished to provide a permanent home for the girls. In July 2007, the juvenile court granted Fresno County Department of Social Services' (Department) section 387 petition to change the girls' placement from relative placement to foster care. The girls were placed with foster parents who were open to adoption, but wanted additional time with the girls before committing to a more permanent plan. At the section 366.26 hearing, the

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] This court affirmed the juvenile court's order denying mother reunification services in an unpublished opinion, *In re M.S.* (Oct. 12, 2006, F050054).

2.

juvenile court found that while the girls were likely to be adopted, termination of parental rights would be detrimental to them because their foster parents were unable or unwilling to adopt because of exceptional circumstances, but were willing and able to provide the girls with a stable and permanent home. Accordingly, the juvenile court retained jurisdiction and ordered long term foster care as the girls' permanent plan.

A review hearing was held in February 2008. The girls had been moved to a new foster home that month. The care providers, Heather and Ruben R., were interested in pursuing adoption, but the Department wanted to wait until the girls had been in the home for six months before scheduling a permanency planning hearing. The juvenile court continued the girls in foster care. By August 2008, the R.s still wanted to adopt the girls. Accordingly, the Department recommended that the juvenile court set a section 366.26 hearing and select adoption as the girls' permanent plan. A contested review hearing was held in September 2008, at which the juvenile court ordered bonding studies for the girls with their parents and the R.s.

A bonding assessment was completed by Kerri Freeman, LMFT, at California Psychological Institute, over the course of several interviews with the girls, father, and the R.s; the report was issued in May 2009. Freeman opined that (1) the girls had a parent/child relationship with father; (2) the girls had a "substantial positive emotional relationship" to father such that they may be greatly harmed if the relationship were terminated; and (3) continuing the relationship would promote the girls' wellbeing to such a degree as to outweigh the wellbeing they would gain in a permanent home. Freeman recommended father's relationship not be severed and that he continue to work toward having the girls returned to his care. Freeman believed the girls were struggling with the thought of adoption due to the parent/child relationship they had with father and their fear of losing that bond.

Based on this, the Department opined that while the girls were generally adoptable, their significant bond with father meant that adoption would be detrimental to

them if they were unable to continue that relationship following the adoption. Since the R.s were unwilling to allow the girls to visit father if they adopted the girls, the Department believed it would be detrimental to terminate parental rights. While the R.s initially stated they wanted the girls removed from their home if the court did not order adoption, they later changed their minds and agreed to provide a permanent plan of guardianship and to transport the girls for visits with their parents. The Department therefore recommended a permanent plan of guardianship with dependency.

At the July 2009 section 366.26 hearing, the juvenile court found that termination of parental rights would be detrimental to the girls because their parents had maintained regular visitation and contact, and the girls would benefit from continuing those relationships. The juvenile court also found guardianship to be the girls' appropriate permanent plan, appointed the R.s as their legal guardians, and continued dependency jurisdiction. Father was given twice monthly supervised visitation, with the Department given discretion to move to unsupervised visits.

A review hearing was held in January 2010. The girls were doing well in their placement. Father wanted to reunify with the girls. The social worker had observed the girls' visits with father and saw there was a strong bond between them. Father communicated and interacted well with the girls, and was affectionate with them. Father had been compliant with his supervised visitation schedule; his wife Andrea, her children, and his biological daughter, Alexis S., also participated in the supervised visits and interacted well with the girls. Father had been drug testing and his tests were all negative. While the R.s still wanted to adopt the girls, the Department opined that adoption was not in the girls' best interests given their strong bond with father. At the review hearing, the juvenile court continued the guardianship, as well as dependency jurisdiction, and ordered that father's twice-monthly visits move from supervised to unsupervised.

In a report prepared for the July 2010 review hearing, the social worker stated that the girls thought visits with father were going well and they enjoyed visiting him. The R.s reported minor changes in the girls' behavior once unsupervised visits began, but their behavior had improved. The girls told a social worker they wanted to return to father's care. The social worker noted, however, that the girls appeared to be torn between wanting to reunify with father and to remain with the R.s. Accordingly, the social worker referred the girls for mental health assessments to see if they could receive therapeutic services that would help them deal with their feelings and mixed emotions. Father had completed a 52-week parenting class, a 52-week batterer's treatment program, and a drug rehabilitation program. The Department continued to recommend guardianship with dependency as the most appropriate plan for the girls.

The girls completed their mental health assessments in July 2010. In Alexandria's assessment, the therapist, Sharon Schafer, LMFT, noted she had been thriving in the R.s' home without behavior problems until the visits with father changed from supervised to unsupervised. The visits caused Alexandria difficulty with conflicting loyalties between father and the R.s, as well as intermittent temper outbursts after visits lasting two to three days. Alexandria said she and her sister disagreed on what to tell the R.s about time spent with father, and that Andrea had hurt her feelings. Alexandria was burdened with the belief that ultimately she would decide who she would live with; she trusted and loved the R.s, but yearned for mother and father to parent her well even when she was aware there were often problems at her visits. Schafer recommended visits returned to supervised, as the abrupt change had caused Alexandria distress, and visits move to unsupervised slowly when the Department was convinced the parents could act appropriately. Schafer expected Alexandria's symptoms to become more severe and problematic if she remained in the current situation of not knowing where and with which family she would live out the rest of her childhood.

5.

Despite this assessment, the Department recommended the court grant discretion for liberal visits between father and the girls. While the Department acknowledged Alexandria's mixed feelings and emotions regarding placement, and that the R.s initially reported some behavioral changes when visits moved from supervised to unsupervised, the social worker noted the R.s had reported the girls' behavior had returned to normal. The social worker did not believe there was any reason to move the visits back to supervised, as the girls had not reported any significant concerns or issues with visits, and father had been consistent and compliant with visits.

The Department thereafter received Mercedes' assessment, in which the therapist, Janet E. McKee, LCSW, also recommended visits return to supervised with a slower transition to unsupervised when the parents' behavior became appropriate. McKee was concerned about Mercedes' behavior when she returned to the R.s after unsupervised visits; after one visit, she cried on the way home and would not say what was wrong or what happened at the visit. Mercedes said that father told the girls they could not move home yet, which upset her, and also told them it was not any of the R.s' business what the girls did with him. It appeared to McKee that father had talked to the girls about the case and was trying to control what information got to authority figures about their visits with him. McKee believed the move to eight hours, twice monthly, unsupervised visits upset Mercedes' normal balance and set up a situation where she had conflicting loyalties.

On July 28, 2010, the juvenile court ordered the Department to hold a staffing with the involved parties to identify a case plan goal for the girls and discuss concerns regarding the case. A staffing was held on August 12, 2010, with mother, father, and the R.s all present. The parties were advised the Department's recommendation was for the girls to remain in legal guardianship with the goal of reunifying with father, as the visits with him were going well and he had completed all of the reunification services originally ordered, and that the Department have discretion to move to liberal visits. The Department recognized McKee's recommendation regarding visits between Mercedes

6.

and father, but discounted it as it appeared to be based on information obtained from the R.s and not Mercedes. The Department did not agree with the recommendation as it had assessed the contact between Mercedes and father to be appropriate, and Mercedes had not reported any concerns about father's behavior.

On August 25, 2010, the juvenile court continued the review hearing and ordered the Department to develop a transition plan regarding visits between the girls and father. The social worker spoke to McKee and told her the Department did not agree with her recommendation since visits were going well and father had completed his services. McKee nevertheless continued to have concerns due to father's history of violence, the reported fighting going on between father and his "girlfriend," and father's instruction to Mercedes that she not disclose to anyone what happens during visits. McKee believed father placed the girls at risk by instructing them to "keep secrets" in violation of "CPS rules," and it was important to move in a slow and consistent manner, with a systematic progression, when someone has a history of violating "other's rights" or the "rules." Schafer's recommendations regarding Alexandria also did not change in light of the information regarding visits and father's completion of services.

Despite the opinions of McKee and Schafer, the Department continued to recommend that the juvenile court give it discretion for liberal visits, as the girls had not disclosed any concerns that father or Andrea were inappropriate during visits or that the girls did not want to visit; to the contrary, the girls told the social worker they wanted to live with father. On September 2, 2010, the social worker spoke with the girls' attorney, who reported they told him they wanted to stay overnight with father.

On October 12, 2010, the juvenile court continued the review hearing so the Department could conduct a staffing to discuss the girls' permanent plan. At the November 4 staffing, at which the R.s, mother and father were present, it was decided to have the girls remain in legal guardianship, the Department submit a new mental health referral so the girls could receive therapy, and that father's visits remain unsupervised.

7.

Everyone, except father, agreed with these decisions. While the girls were stable, doing well with the R.s, and were excelling in school, there was concern about their conflicting feelings regarding their loyalties to the R.s and parents. At the November 16, 2010 review hearing, the juvenile court continued the legal guardianship, ordered mental health assessments, and continued father's unsupervised visits to be scheduled by the social worker.

In a report prepared for the next review hearing, the Department stated that the girls were participating in twice monthly unsupervised visits with father. According to the girls, the visits were going well and they enjoyed them. Concerns were reported, however, that father and Andrea argued in front of the girls, and Andrea yelled and used profanity towards one of the girls. When confronted about this, father and Andrea both denied that either occurred. Andrea stated she and everyone else in her family had a good relationship with the girls, who called her "mommy." When the social worker spoke to the girls about the concerns, their statements were inconsistent.

The girls' mental health assessments were completed in January 2011. Freeman assessed Mercedes; Freeman did not recommend ongoing therapeutic services and was unable to provide a recommendation as to visits as she did not know Mercedes. Freeman stated that, according to Mercedes and Ruben, Mercedes only experienced minor symptoms for a few hours following visits with father. Freeman did not see this as abnormal for a child adjusting from one parent or situation to another. Mercedes did not report anxiety, sadness or ongoing symptoms during the week. Freeman felt any recommendation regarding visitation needed to come from someone who knew Mercedes best and worked with her. Alexandria was assessed by therapist Brooke Pfister, who recommended ongoing therapeutic services due to symptoms of anxiety, worry, sadness and withdrawal. Pfister also could not provide a recommendation regarding visitation.

At the February 2, 2011, review hearing, the juvenile court continued the guardianship and dependency, and ordered the Department to set up a visitation schedule.

8.

The juvenile court continued the review hearing to February 23 to address visitation. At a subsequent Department staffing, the R.s presented a proposed visitation schedule of one eight hour visit per month for each parent, with an additional visit for father in July and for mother in December. While mother, the R.s and the Department agreed that the plan was least restrictive and provided the most stability for the girls, father did not agree with the plan as he did not want to lose one of his visits. The Department recommended the juvenile court adopt the visitation plan, which the juvenile court did at the February 23 hearing.

In a report prepared for the July 2011 review hearing, the Department recommended that a section 366.26 hearing be set to allow the Department to assess the girls for adoption. The Department reported on visitation. The R.s raised concerns about the March 12, 2011 visit. The R.s claimed father told the girls he was going to rip the R.s' faces off, and presented a voice recording they said was of Alexandria telling them what father said to her. Father claimed he would never make such comments to the girls. The social worker was unable to confirm with the girls whether the statement actually was made.

Father did not attend the remainder of his monthly visits. Andrea cancelled the April 9 visit, as father could not attend because he was working out of town. No visit occurred in May and father did not contact the Department. The social worker called father on June 1 to ask why he missed a visit scheduled for May 7, but father did not have an excuse. Father missed a visit scheduled for July 2, 2011 and failed to contact the Department. The R.s also reported that father did not attend visits on January 29 and February 26, 2011. Due to father's inconsistency in attending visits and his failure to keep the social worker informed about missed visits, the Department recommended father's unsupervised visits change to quarterly due to the negative effect the missed visits had on the girls.

9.

The R.s reported to the social worker that Alexandria was having some behavioral issues after visits with father, such as acting out, talking back, and being defiant and disrespectful. The R.s at first stated the behaviors lasted a couple days, but later reported they lasted a couple months dating back to the last visit with father on March 12, 2011. Alexandria had since returned to her normal self. Alexandria's behaviors were reported to her therapist, who was working with her on reducing the symptoms of anxiety, worry, sadness and withdrawn behaviors.

A contested hearing was set on the issue of whether to set a section 366.26 hearing, and whether the R.s were inhibiting visitation. On September 6, 2011, the juvenile court ordered a second bonding study, to be conducted by someone other than Freeman. The juvenile court further ordered the Department to provide an update regarding the number of visits the parents had attended, and that visitation continue as previously set. The court set a section 366.26 hearing for January 3, 2012.

In a report prepared for the January 3, 2012 hearing, the Department recommended that the girls' plan remain guardianship with dependency and that father's visits increase to twice per month, with discretion for overnight visits. The social worker explained that while the girls were generally adoptable and the R.s wanted to adopt them, they had a significant bond with father and it would be detrimental to them to sever that relationship. The social worker cited the 2009 California Psychological Institute (CPI) bonding study by Freeman, in which Freeman recommended father's relationship with the girls not be severed and father continue to work towards the hope of having the girls returned to his care.

Pursuant to the juvenile court's order, a request for a second bonding study was sent to CPI. Kathleen Romeiro, LCSW, from CPI, told the social worker that in her opinion a bonding study was not an appropriate tool to assess the concerns related to a possible plan of adoption since one had already been completed which determined a significant bond existed, and father's missed visits would not negate the established bond.

Instead, Romeiro recommended the Department investigate why father did not attend his visits and interview the girls about their wishes for placement. Father had appeared for an interview at CPI as part of the bonding study; he told Romeiro he missed visits because he did not have a car or driver's license, and the R.s were only willing to bring the girls halfway between their home and his. The Department thereafter made a referral to Collegium Scientifica for the second bonding study.

The social worker reported that father had missed one visit out of eight. The social worker observed visits on November 16 and December 7, 2011; the girls were very happy and excited to see father. Father brought the girls snacks and gifts, and interacted appropriately with them. The girls appeared more outgoing and lively in his presence. The social worker noted it appeared there was ongoing tension between the R.s and father regarding visits, and the girls were caught in the middle and afraid to express their feelings about the visits for fear that either the R.s or father would become upset with them. The girls had shared with the social worker that they did not want to be adopted and would like to live with father.

The girls had been in the R.s' care for four years; they were stable and doing well there. Despite that stability, the girls maintained a close relationship and attachment with father. The social worker had observed the girls with father; they appeared comfortable and happy with him. Father had demonstrated he was loving and nurturing toward the girls, who in turn demonstrated that same love and affection by hugging father and sitting in his lap during visits. The social worker noted that when Mercedes was with the R.s she was timid and quiet, while when she was with father, she came out of her shell and become animated, talkative and happy. The social worker believed that the different parenting styles of the R.s and father caused tension and conflict in "their relationship."

The section 366.26 hearing was continued to April 3, 2012, and again to May 9, 2012, so the bonding study could be completed. In May 2012, a Court Appointed Special Advocate (CASA) who had been appointed to the case in November 2011, completed a

11.

CASA report. The CASA observed a portion of a visit on April 14, 2012, between father and the girls at father's home. The girls appeared to be enjoying themselves, and they interacted well with father and the other children in the home. At the conclusion of the visits, Andrea and Alexandria took photographs and laughed together. The girls later told the CASA, when asked if they had a good time at the visit, they have fun during visits and enjoy spending time with father and Andrea. Alexandria was in therapy at CPI, where she saw a therapist twice per month. In February 2012, Heather gave the CASA an envelope with several letters addressed to the court and the social worker which Alexandria wrote. In one letter, Alexandria stated that after giving the R.s, who she called "Mom & Dad," a hug and kiss before getting into the car with father and Andrea for a visit, she was yelled at: "They're nothing to you and will never be. Don't hug them. They're not your parents, we are." Alexandria wrote that father "always shouts," which makes her sad and disappointed.

The second bonding study was completed in May 2012, by psychology trainee Andrea Ormonde, M.A.; the study also was signed by Laura A. Geiger, Psy.D.. Ormonde reviewed social study reports and the bonding study by Freeman, conducted clinical interviews, and had the parties perform various tests. Ormonde opined that, based on a "thorough review of the case reports, a clinical interview, a mental status examination, and review of the test dat[a,]" father and the girls did not have a parent/child relationship; and father seemed to take on the role of an extended family member instead of a parent, "which would require providing structure, engagement, nurturing and appropriate challenging." Ormonde further opined that: (1) while the girls seemed to have beneficial emotional attachments to their parents, both mother and father exhibited a lack of parenting skills, deficits in insight, and sporadic visitations which suggested the girls would not be greatly harmed if the parent/child relationships were terminated; (2) continuing the parent/child relationships would not outweigh the wellbeing the girls would gain in a permanent home with adoptive parents; (3) the girls and the R.s had a

12.

parent/child relationship; and (4) the girls had a positive emotional attachment with the R.s and severing that relationship might reinforce the abandonment the girls had experienced.

Ormonde noted that the girls both had significant clinical problems, for which Alexandria was being treated currently and for which Ormonde was recommending Mercedes receive treatment. Ormonde opined the girls' emotional stability would be enhanced greatly with continuing their current home life, while further disruption would likely cause regression and further psychological damage. Ormonde reported that father, when asked why the girls were still in the foster care system, responded he was unsure as he had completed all of the services two and a half years ago. Father believed the judge assigned to the case had been biased against him from the start and did not want him to have the girls. Father adamantly declared it was not his fault the girls were removed from his and mother's care in the first place, as the children were at mother's house.

Based on the second bonding study, the Department changed its recommendation from guardianship to adoption with termination of parental rights. The social worker noted that the R.s wanted to adopt the girls; the R.s exhibited an excellent ability to provide structure, extracurricular activities and routines for the girls that were appropriate for their developmental level. The social worker opined that while the girls had a positive relationship with father, it did not outweigh the benefits that adoption would provide, as the girls would benefit from having a stable, loving and nurturing home environment that the R.s were providing. The social worker further noted the R.s recognized the importance of the birth parent relationship and were open to maintaining the girls' relationships with their biological parents by mediating a post-adoption agreement through the Consortium for Children.

The contested section 366.26 hearing ultimately was held in July 2012. The Department submitted on its reports, the May 2012 bonding study and the curriculum

13.

vitae it submitted for Geiger and Ormonde. Father called the social worker Leticia Simental, the girls, the R.s, Andrea and himself to testify.

Simental, a social worker in the assessment adoptions area who had been assigned to the case for the preceding 11 months, testified that she changed her recommendation from guardianship to adoption based on the May 2012 bonding study and Alexandria's letter in which she stated she wanted to be adopted. Simental had stated in a prior report that the girls had a significant bond with father that would be detrimental to the girls to sever; this opinion was based on her review of the file, including the 2009 bonding study, as well as two visits between the girls and father that she observed where she witnessed the girls' bond with father. Other than the May 2012 bonding study, Simental did not have any reason to believe that the bond between the girls and father had diminished since 2009. The decision to change the Department's recommendation was made by Simental and her supervisor.

Eleven-year-old Mercedes testified that she did not want to be adopted by the R.s because she wanted to live with father. Mercedes denied that any problems or bad things happened during her monthly visits with father. Mercedes said she had a good relationship with Andrea, who she called "Mom," and denied that Andrea was mean to her or Alexandria. Mercedes wanted more visits with father. She did not have any specific reason why she did not want to live with the R.s.

Ten-year-old Alexandria testified she calls the R.s "mom" and "dad." Alexandria confirmed the incident occurred that she wrote about in the February 2012 note, in which Andrea yelled at her and said the R.s were not her biological parents. Alexandria's relationship with Andrea had improved since February; Alexandria felt comfortable with Andrea, as Andrea had gotten nicer. Alexandria wanted to be adopted by the R.s. If the judge ordered adoption, however, she still wanted to see father. Alexandria said she told Mercedes that if they lived with father or mother, then they could not see the R.s, their friends or the R.s' family anymore, but if they lived with the R.s, they would get to see

14.

father, mother and the R.s. Alexandria wanted to be adopted because she had lived with the R.s for nearly five years, she did not want to move to a different home, and she wanted the R.s to be her parents.

Heather confirmed the girls had lived with them since February 2008, and that they had wanted to adopt the girls ever since she and her husband took placement of them. Heather saw the girls immediately after their visits with father; she was concerned about their transitions back to their home following those visits. Mercedes would become very withdrawn, while Alexandria would become more defiant. The girls did not act this way after visiting other people the R.s knew. The girls had made statements after visits to the effect that they, especially Alexandria, had been treated unkindly or unkind words had been said about the R.s. Heather suspected Alexandria became more defiant because she was returning from a situation in which she was treated badly. Heather was also concerned about the "language choice" being used in father's home, which the R.s would not use in their own home. Alexandria had begged Heather several times not to make her go visit father. Heather knew that if adoption were ordered, Mercedes wanted to continue to visit father; she believed Alexandria would also want to continue visiting him, but she was not sure about that.

Ruben R. also knew that the girls wanted to continue to visit father if adoption were ordered. He agreed that the girls have a bond with father. He also agreed that Mercedes loves father, looks forward to visiting him and was disappointed when she could not visit him. Alexandria wanted to see father "[o]n her terms"; Ruben did not think she wanted to see him very often. Alexandria was not necessarily happy when father showed up for visits or happy to go with him, although she did want to maintain contact with him.

Father testified about the second bonding study. He was concerned after he showed up for the study because the person conducting the study, Ormonde, said she was an intern and Geiger would not be there. Father said it took him about 20 minutes to

15.

answer a survey of about 100 to 120 questions. After that, the girls were brought into the room and Ormonde had them do six different "exercises," which were filmed. When they finished the exercises, the study was over. Father estimated the girls were in the room for about 20 minutes. Father never had any contact with Geiger. During the first bonding study with Freeman, father was there for about three hours, while the second study took less than an hour. Ormonde did not inquire into his background or history, and did not ask questions of a personal nature.

Father objected to the girls being adopted because he believed they would be better off and happier with him, and they wanted to come home with him. Father wanted the girls returned to him. Father admitted missing visits in January and March, but claimed this was due to miscommunication, as he did not have an established schedule for visits. Father explained that the R.s had a calendar from the previous year, so when he showed up for visits, they claimed the visit was the week before. His social worker admitted there was a misunderstanding and said she would make a schedule, but he never received one.

Andrea testified that she and father had married and lived together for five years, along with her four teenage children. Andrea felt like she knew the girls well and had a good relationship with both of them. Andrea confirmed the two missed visits were due to misunderstandings with the R.s about the visitation schedule.

Father recalled Simental, who confirmed that in the section 366.26 report she had recommended father's visits be increased to twice monthly unsupervised visits, with discretion for liberal visits, which would include overnight and extended day visits. She recommended the increased visits because visits were going well, the girls told her they wanted more visits, and father had been visiting consistently. The previous social worker had requested that father's visits be reduced because father had missed a significant number of visits. Simental heard father's testimony about the missed visits and agreed there was a scheduling problem. If the court ordered guardianship to continue, Simental

16.

had no reason to change her prior recommendation for increased visitation. Simental understood that the visits father missed between March and July 2011 were due to transportation issues father was having. From August 2011 to July 2012, father had missed two visits.

Father's attorney argued the only reason the Department changed its recommendation was the second bonding study, to which the court should not give very much, if any, weight. He argued there were three deficiencies in the second bonding study (1) Ormonde's lack of experience, (2) the amount of time she spent on the study, and (3) that her conclusions were to the ultimate questions of fact and law the juvenile court was to answer. For these reasons, he urged the court to not consider the second bonding study. He asked the court to maintain the legal guardianship, which would give father an opportunity to try to have the case returned to family reunification; if reunification failed, then the court could "draw[] the line." Father's attorney asserted the girls' desire to maintain their relationship with father, with whom they had a strong bond as shown by the 2009 bonding study, outweighed the benefit and permanency that would come from adoption.

Mother's attorney also argued against termination of parental rights. She further argued there was a significant attachment between father and the girls, pointed out the weaknesses in the second bonding study, and asked the court to continue the girls' relationship with father. The girls' attorney asserted that neither girl wanted to give up contact with father and, based on their testimony, he thought their best interests were served by reunifying them with father. He believed the bond between father and the girls was a strong one and more beneficial to the girls than the permanency provided by adoption.

County counsel admitted there was an attachment between the girls and father. He argued, however, that the second bonding study showed they did not have a parent/child relationship, and when considered with the evidence the girls were having clinical

17.

problems, showed that adoption outweighed any benefit from a continued relationship with father. The R.s' attorney asserted the court must find the girls' wellbeing would be best served by a permanent plan, and while there may be a positive, beneficial bond between the girls and father, that bond was not so strong as to outweigh the preference of permanence and stability.

After hearing the parties' arguments, the juvenile court took the matter under submission. In its oral ruling the following day, the juvenile court explained that there was clear and convincing evidence the girls were adoptable, therefore parental rights should be terminated unless an exception to termination applied, namely where the parents have maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship. The juvenile court found father had satisfied the first prong of the exception, as he maintained regular visitation and contact with the girls. Turning to the second prong, the juvenile court stated that to find in father's favor, it had to find the parent/child relationship promoted the child's wellbeing to such a degree that it outweighed the wellbeing the child would gain in a permanent home with adoptive parents. The juvenile court found that father had not met his burden. While it was clear to the court father had worked very hard to restore his life, it could not escape the fact that for a significant percentage of the girls' lives, longer than father had custody of them, the R.s had been their parents. Given the considerable burden he bore to show that he had a parental bond with the girls, he had not met that burden. Accordingly, the court "reluctantly" adopted the Department's recommendation for adoption, noting that the girls, and Mercedes in particular, really cared about him. The court found the girls were likely to be adopted, terminated parental rights, and ordered the girls placed for adoption.

## DISCUSSION

Father reiterates his argument to the juvenile court, namely that termination of his rights would be detrimental to the girls. He claims the record supports such a finding under section 366.26, subdivision (c)(1)(B)(i) based on his regular visitation and contact

18.

with the girls, and their bond with him.  He also claims the juvenile court erred when it admitted the second bonding study into evidence.

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child.  (*In re S.B.* (2009) 46 Cal.4th 529, 532.)  The Legislature's preferred permanent plan is adoption.  (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.)  "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi).  (§ 366.26, subd. (c)(1).)"  (*In re D.M.*, *supra*, 205 Cal.App.4th at p. 290.)  In this case, father does not dispute that the girls are adoptable; he contends only that the parent-child relationship exception applies.  (§ 366.26, subd. (c)(1)(B)(i).)

To avoid termination of parental rights under the parent-child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  It is the parent's burden to prove the exception applies.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Id.* at p. 575.)  "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly

harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F., supra,* at p. 555.)

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].) Father argues the substantial evidence standard of review applies, while the Department asserts review is for abuse of discretion.

Our conclusion in this case would be the same under any of these standards because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to

analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . .'"'" (*Id.* at p. 1351.) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial relationship cannot succeed unless the undisputed facts establish the existence of a beneficial parental relationship, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1529; *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

In this case, it is undisputed father maintained regular visitation and contact with the girls. The juvenile court, however, found that father had not met his burden of proving that the girls would benefit from continuing their relationship with him, as he had not shown that relationship promoted the girls' wellbeing to such a degree that it outweighed the wellbeing the girls would gain in a permanent home with new adoptive parents. Father contends the juvenile court erred in so finding, because the evidence showed the girls were bonded to him and he acted in a parental role when he was with them, and throughout the proceedings, the Department and juvenile court both found the girls' bond with him to be so substantial that termination of parental rights would be detrimental to them. He argues this evidence shows the girls had a substantial, positive, emotional attachment to him.

Father, however, ignores the other evidence that supports the juvenile court's decision. The girls certainly were bonded to him, as they enjoyed visiting him, wanted to continue to visit, and at least Mercedes wanted to live with him. But visits also had a negative effect on the girls. Their 2010 mental health assessments show they were torn between the R.s and father, and their behaviors worsened after visits with him. There was evidence that father and Andrea engaged in inappropriate behavior during visits that distressed the girls, such as yelling in front of them, using profanity towards one of them,

and speaking badly about the R.s. These problems were recognized when father's visits were reduced to once per month in 2011.

By January 2011, Alexandria had developed symptoms of anxiety, worry, sadness and withdrawal, which needed to be addressed in therapy. While she had difficulty transitioning back to the R.s following visits with father, her behavior stabilized when father missed several months of visits in 2011. Significantly, there was no evidence that the lack of contact during this period greatly harmed either girl. Although the girls told the social worker at the end of 2011 that they wanted to live with father and did not want to be adopted, there is evidence that father's inappropriate behavior continued during visits, such as father and Andrea yelling at Alexandria not to hug the R.s because they are not her parents, and that visits continued to negatively affect both girls when they returned to the R.s' care. By 2012, Alexandria still required therapy to address her clinical problems and Mercedes also needed further psychological evaluation and possible therapy. In the 2012 bonding study, Ormonde reported that when the girls described their feelings about missing visits with their parents, they both shrugged and stated that while they were sad, it usually meant they got to participate in other events. At the hearing, Alexandria testified she wanted to be adopted. While Mercedes testified she did not want to be adopted, the parties and the juvenile court all recognized at the hearing that the girls had a sibling bond that should not be broken.

Given the emotional problems the girls were having following visits with father and the stability they experienced while in the R.s' care, the juvenile court reasonably could find, as it did, that the girls' need for permanence outweighed the benefits they would derive from a continued relationship with father. It also could find that severing the girls' relationship with father would not deprive them of a substantial, positive emotional attachment that would greatly harm the girls.

Father contends the only evidence that supports the juvenile court's decision is the 2012 bonding study, which the juvenile court erroneously admitted into evidence. He

asserts the 2012 study was inadmissible because the person who conducted the study and authored the report, Ormonde, was not qualified to give an expert opinion as she was only an intern and not a licensed psychologist. The Department asserts father has forfeited this issue because he failed to object to admission of the 2012 bonding study before the juvenile court. We agree with the Department.

The record shows that father did not lodge any type of objection to the 2012 bonding study's admissibility, and therefore may not claim on this appeal that the bonding study was inadmissible. (Evid. Code, § 353.) Moreover, the 2012 bonding study was not required for the juvenile court to reach its conclusions at the section 366.26 hearing. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) Father's criticisms of the 2012 bonding study amount to nothing more than an invitation for this court to reweigh the bonding study's worth in the decision-making process. That is not our function as a reviewing court. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Father contends this case is like *In re S.B.* (2008) 164 Cal.App.4th 289, in which the Court of Appeal concluded the beneficial relationship exception does not require the parent to prove that the child has a "'primary attachment'" to the parent or that they have maintained day-to-day contact; instead, the exception may apply when the child has a "'substantial, positive emotional attachment'" to the parent. (*Id.* at p. 299.) The father in *S.B.* had loving, "regular, consistent and appropriate visits" with the child, and consistently put her needs ahead of his own. When the child was removed from his care, he started services, maintained his sobriety, sought services, and complied with every aspect of his case plan. (*Id.* at p. 298 .) On the record before it, the Court of Appeal concluded that the "only reasonable inference" was that the child "would be greatly harmed by the loss of her significant, positive relationship" with the father. (*Id.* at p. 301.)

The same cannot be said here. While we recognize that father's visits went well and he shared a loving relationship with the girls, the girls were having emotional

difficulty dealing with the visits. Moreover, there is evidence that shows father and Andrea did not act appropriately during visits, which created emotional conflicts for the girls. On the entire record, we cannot say that no judge reasonably could have made the decision made here, i.e. that father failed to prove the girls would benefit from continuing their relationship with him; neither can we say that the undisputed facts lead to only one conclusion. Accordingly, we have no choice but to affirm the juvenile court's order.

## **DISPOSITION**

The order terminating parental rights is affirmed.


_____
Gomes, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Cornell, J.